CHARLES A. WHEELER, JR., et al., Trustees of Dalewood Baptist Church for themselves and for the Use and Benefit of Jersey Insurance Company et al., Appellants, v. FRED WRIGHT CONSTRUCTION COMPANY and Donald Cowan, Appellees.

CHARLES A. WHEELER, JR., et al., Trustees of Dalewood Baptist Church for themselves and for the Use and Benefit of Jersey Insurance Company et al., Appellants, v. FRED WRIGHT CONSTRUCTION COMPANY and Joe Reynolds and John W. Reynolds, d/b/a Reynolds Brothers Plumbing and Heating and Air Conditioning Company, Appellees.—415 S.W.(2d) 156.

Middle Section. November 25, 1966.

Certiorari Denied by Supreme Court May 15, 1967.

78

F. Clay Bailey, Jr., of Bailey, Ewing & Dale, Nashville, for plaintiffs-in-error.

J. O. Bass, of Bass, Berry & Sims, Nashville, for defendant-in-error, Donald Cowan.

Morton B. Howell, Jr., of Howell & Fisher, Nashville, for defendant-in-error, Fred Wright Construction Co.

Olin White, of Manier, Crouch, White & Herod, Nashville, for defendants-in-error, Joe Reynolds and John W. Reynolds, d/b/a Reynolds Brothers Plumbing, Heating and Air Conditioning Company.

PURYEAR, J. These two consolidated cases are suits for property damage which arose out of the explosion of a boiler located upon the roof of Dalewood Baptist Church.

The suits were instituted by plaintiffs on September 10, 1962, following an order of non-suit at an earlier trial, seeking to recover for damages to the educational building of their church resulting from the aforesaid explosion.

One suit was filed against the defendant, Fred Wright Construction Company, the general contractor for the building and Joe Reynolds and John W. Reynolds d/b/a Reynolds Brothers Plumbing, Heating and Air Conditioning Company, who was a plumbing sub-contractor in the construction of the building.

The other suit was filed against the defendant, Donald Cowan, who was architect for the building project.

The declaration against Cowan alleges that he acted as architect for and on behalf of Dalewood Baptist Church in the construction of the educational building where the explosion occurred out of which these suits arose.

In the declaration against Cowan the defendant was charged with breach of contract, also violating certain rules and regulations adopted by the Tennessee Board of Boiler Rules pursuant to the authority of Tennessee Code Annotated, Section 53-2702.

The declaration in the suit against Fred Wright Construction Company and Reynolds Brothers also alleges breach of contract and violation of the rules and regulations of the Boiler Code Commission.

The defendant, Cowan, filed a plea of the statute of limitations and also a plea of general issue. The other defendants also filed a plea of the statute of limitations, the general issue and a special plea relying upon the provisions of Article 20 of the general conditions of the contract between the parties and likewise Article 31 of the general conditions, the defense of laches, and further alleged that the plaintiffs violated certain provisions of the rules and regulations adopted by the Board of Boiler Rules.

The cases were consolidated and tried together. The trial Judge overruled the pleas of the statute of limitations and after a trial upon the merits, the jury found in favor of all defendants in both cases.

Within the proper time, plaintiffs filed motions for a new trial which were overruled by the trial Judge and the plaintiffs now prosecute writs of error in this Court. Since the cases were tried together, we will refer to them in this opinion as one case.

There is abundant evidence in the record to support the verdicts of the jury and all of the assignments of error are directed toward actions of the trial Judge in giving certain instructions to the jury, refusing requested instructions and making certain remarks in the presence of the jury.

We find a very concise, but correct statement of the case in the brief of counsel for defendant, Fred Wright Construction Company, and we will adopt and closely follow it in making a statement of the case in this opinion.

This is not to say that the case is not correctly stated in the other briefs, because it is, but in the interest of brevity, we prefer to adopt the one which is more concise than the others.

## STATEMENT OF THE CASE

A contract for the construction of an educational building was made between the trustees of Dalewood Baptist Church, as owners, and Fred Wright Construction Company, as general contractor, and signed by the parties on May 13, 1954, in which Donald Cowan was named as architect and also served as a witness to the contract. This document was accompanied by exhibit number two "Brochure of Specifications," which provided more detailed directions to the general contractor for his own work and for those sub-contractors associated with him in the construction of the educational building.

Work was promptly commenced by Wright and was delayed only by certain sub-surface conditions encountered which required a change in design by the architect and other corrective measures later.

The sub-contract between Wright and Reynolds Brothers for plumbing, heating and air conditioning was signed May 26, 1954, and this work was done by Reynolds Brothers under the direction of their working foreman, Thomas Harrington, with J. T. Jackson as job superintendent for Wright.

The project was substantially completed in March, 1955, and the final inspection and acceptance of the building by the owners occurred on or about April 1, 1955.

Present for this inspection and acceptance were the architect, Cowan, the prime contractor, Wright, one of the Reynolds brothers, Mr. Wheeler and Mr. White, Trustees of the Church and also the minister, Reverend Dunlap.

At the time of acceptance, Reverend Dunlap was given instructions concerning the operation of the heating system, which included two boilers, one located in the basement and the other upon the roof in a penthouse. It was also agreed that certain corrective action made necessary by the sub-surface conditions would be accomplished by the general contractor within the one year warranty period following acceptance. This was done and the general contractor was paid in July and August, 1956.

Fire and extended coverage insurance polices were issued by the Northern Insurance Company, Jersey Insurance Company, Merchants Fire Assurance Corporation and Potomac Insurance Company.

Following completion, acceptance and occupancy of the building by its owners in April, 1955, the next contact between the owners and Reynolds Brothers occurred about November 16, 1955, when Reynolds was called to check the heating system. John Reynolds answered this

call. He inspected the furnace in the penthouse, found that it was operating and the relief valve was functioning properly, but that the aquastat had become stuck and non-functioning and he replaced it with a new one free of charge.

At this point we think it necessary to state that the boiler in question here was equipped with several valves which performed various functions and here we will undertake to give a description of these valves.

1. The gate valve, which was an ordinary hand operated valve used to cut the water off and on, but actually this was a part of the plumbing and not a part of the boiler itself.

2. A Bell and Gossett (B. & G.) pressure reducing valve, the function of which is to reduce the city water pressure from its normal 65 to 70 pounds down to 12 pounds, and this valve was also located on the plumbing line and not on the boiler itself.

3. A Watts valve which was installed upon the plumbing line to serve primarily as a temperature relief valve and it contained an element which would melt at a temperature slightly below the boiling point at 210 degrees Fahrenheit and thus prevent excessively hot water from flowing back from the boiler through the plumbing line and into the pressure reducing valve. This valve was installed for the purpose of preventing damage to the pressure reducing valve as a result of excessively hot water flowing back into it from the boiler.

4. A Bell and Gossett (B. & G.) one and one-fourth inch pressure relief valve placed on the header of the boiler for the purpose of protecting the boiler from ex-

cessive pressure. This valve is required by the boiler code and is referred to in the record and also herein as the ''code'' valve, meaning that it was pre-set at the factory at or below the maximum allowable working pressure of the boiler (30 pounds), but not to be reset, and was equipped with a lever which could be lifted for the purpose of testing the valve and keeping it from getting stuck.

5. A Bell and Gossett (B. & G.) three-quarter inch relief valve, likewise equipped with a testing lever, which was located above the boiler and just below the expansion tank, its primary purpose being as an extra precaution for protection of the expansion tank.

The aquastat, which was replaced by Reynolds Brothers, is not a valve, but it has a function substantially the same as that of a thermostat on a home furnace except that a thermostat is activated by the temperature of the air, while an aquastat is activated by the temperature of the water in the boiler. It turns the gas burner on and off as the temperature gets low or high, as the case may be.

The locations of these valves and controls are shown on a drawing filed in the record as Exhibit No. 24.

It is admitted that none of the parties, plaintiffs or defendants, caused this heating system to be inspected by the State Boiler Inspector or any of his deputies.

The next event following the visit of Mr. Reynolds in November, 1955, occurred on February 3, 1959, when Mr. Wright, of Fred Wright Construction Company, received a call from one of the trustees to report a leaking

roof and to request information concerning the duty of the roofing sub-contractor to repair it.

Upon receipt of this call, Mr. Wright contacted the roofing contractor, The Young Sales Corporation, and advised them of the leak and asked that it be investigated. It was reported to Mr. Wright, shortly afterwards, that it was not the roof which was leaking, but the boiler on the roof was leaking. Mr. Wright communicated this information to Mr. Don Eden, one of the trustees. There was no further communication between Wright and the trustees about this matter, nor was anyone from Reynolds Brothers called.

This visit by Mr. Wright was followed by a call from someone representing the church to Buchi Plumbing Company, and by a visit to the site of the boiler in question in February, 1959, by Mr. Van L. Gray, a steamfitter employed by Buchi. Mr. Gray found the boiler leaking and determined that one of its sections was cracked. He urged the church secretary, who was then in the church office, to let him bring an estimator to the premises to determine the cost of replacing the cracked boiler section.

An estimator was brought to the site, but the record does not disclose that this cracked section was ever replaced. Mr. Gray attempted to repair the crack temporarily by injecting some solder-seal into one of the pipes connected with the boiler.

The next event which occurred was the explosion of the boiler in the penthouse on the roof on the morning of November 23, 1959, four and one-half years after the work was completed and accepted. This explosion resulted in considerable damage to the educational building and out of which explosion these suits arose.

## ASSIGNMENTS OF ERROR

The plaintiffs have filed five assignments of error which are as follows:

### I

"The learned Trial Judge erred in indicating before the jury that regulations of the State Boiler Board are not law if they are not in the Tennessee Code Annotated in the following colloquy:

'THE COURT: Did you find this in 53-3701 [53-2701] TCA, Mr. Bailey?

'MR. BAILEY: That is referring to the implementing section of the Code.

'THE COURT: I know; that's the reason I asked you. You use the word "l-a-w". That's the reason I asked you for the Code Section. It is not in the Code section? Which Code are you referring to?

'I am talking about the Tennessee Code Annotated. That's the only law I know.

'MR. BAILEY: That's et seq.

'THE COURT: Is it in the Tennessee Code Annotated?

'MR. BAILEY: That's the implementing law with respect * * *

'THE COURT: I asked you: Does the Tennessee Code Annotated itself make this requirement?

'MR. BAILEY: Not the Code sections.

'THE COURT: Then it is not the law. That's the point I am making. I can't charge something that is not the

law unless it is in the Tennessee Code Annotated.

'Let the jury step out just a moment.'

## II

The Court erred in refusing Plaintiffs' Special Request No. 2 relative to whose duty it was to have the boiler inspected on installation which reads as follows:

'GENTLEMEN OF THE JURY: I am requested by the Plaintiffs, Trustees of Dalewood Baptist Church, to charge you and I do charge you that:

'Defendants, Fred Wright Construction Company and Joe Reynolds and Jack Reynolds, are charged with the duty and responsibility for having this boiler inspected, tagged and stamped upon installation in accord with the provisions of the Boiler Code of the State of Tennessee and that they breached this duty and responsibility in not having this boiler inspected.'

## III

In refusing this Special Request, the Court erred in instructing the jury that they were to determine whose duty under the regulations it was to have the boiler inspected, in the following language:

'In response to the next special request, I will charge you as follows:

'You have heretofore heard certain regulations read to you requiring having boilers inspected, tagged, and stamped upon installation, and having them inspected on other occasions.

'It will be for you to determine from all of the evidence whether or not the parties or any of them had

the duty of complying with this regulation, and whether or not that duty was breached.'

## IV

'The Learned Trial Judge erred in refusing the Plaintiffs' Special Request No. 1 quoting in part a regulation of the Boiler Code reading as follows:

'GENTLEMEN OF THE JURY: I am requested by the Plaintiffs, Trustees of Dalewood Baptist Church, to charge you and I do charge you:

'The law requires that each of the relief valves for this boiler shall be set to relieve at a pressure at or below the maximum allowable working pressure of the boiler and so arranged that they cannot be reset to relieve at a higher pressure of the boiler.

'Each relief valve shall have substantial device which will positively lift the disc from its seat at least 1/16th inch when there is no pressure on the boiler.

'Such valves shall be B. T. U. rated and shall bear the A. S. M. E. and National Board stamp.'

## V

The Learned Trial Judge erred in instructing the jury as follows rather than in the language of Special Request No. 1:

'In response to a request of the Defendants, I charge you this charge, which is my charge, not their requested charge, but it is being given in response to a charge that was requested by them.

'You have heretofore heard read to you the rules previously referred to. If you should find that a valve was installed which did fully comply with the rules and

regulations, then the fact that another valve was present which did not comply with the rules and regulations would not necessarily make the Defendants liable, unless it be shown that the presence of the valve was the cause of the explosion complained of.

'That is to say, the presence of a valve which would not protect the boiler would not form a grounds for holding the Defendants liable if, in fact, there was a valve installed there which did comply with and satisfy the duties of the Defendants, unless it be shown that the presence of the improper valve was what caused the explosion.' "

## OUR CONCLUSIONS

The colloquy between the Court and counsel for plaintiffs set forth in assignment of error number one occurred at the conclusion of the trial Judge's general charge to the jury and at a time when counsel were invited to submit special requests for instructions.

Counsel for plaintiffs did not except to any of these remarks or ask that the jury be excused and the trial Judge finally excused the jury on his own motion.

It is apparent that these remarks by the trial Judge were made by him simply in an effort to obtain from counsel for plaintiffs the authority upon which he was relying in support of his requests for certain special instructions and we find nothing in the record which affirmatively shows that the jury was affected or influenced by any of these remarks.

Since enactment of the harmless error statute (Section 27-117 Tennessee Code Annotated) in 1911, it has been repeatedly held by this Court and our Supreme

Court that no verdict or judgment shall be set aside or a new trial granted on the ground of error in the charge of the Judge to the jury or for any error in any procedure in the cause, unless in the opinion of the Appellate Court, to which application is made, after examination of the entire record in the cause, it shall affirmatively appear that the error complained of has affected the result of the trial. Thomason v. Trentham, 178 Tenn. 37, 154 S.W.2d 792, 138 A.L.R. 461; DeRossett v. Malone, 34 Tenn.App. 451, 239 S.W.2d 366; Cook v. Blytheville Canning Company, 210 Tenn. 414, 359 S.W.2d 828.

In Trentham v. Headrick, 35 Tenn.App. 330, 245 S.W.2d 632, the Eastern Section of this Court held that before this Court will pass on inadvertent remarks made by the trial Judge, the remarks must first be excepted to and it must be affirmatively shown that the party complaining was prejudiced thereby.

We find no merit in this assignment of error and it is overruled.

We think the trial Judge properly declined to give the special request which is made the basis for assignment of error number two.

In passing upon this assignment, we find it necessary to set forth herein the pertinent provisions of what has been referred to herein as "the boiler code", which consists of a set of rules and regulations promulgated by the State Board of Boiler Rules under the authority of Chapter 27, Title 53 Tennessee Code Annotated, and particularly under Tennessee Code Annotated, Section 53-2702, which pertinent provisions are as follows:

## "PART I

## DEFINITIONS

Paragraph 24—BOILER:

Except where the context clearly indicates otherwise, the term, Boiler, as used in this Chapter, shall mean and include a closed vessel or vessels intended for use in heating water or other liquids or for generating steam or other vapors under pressure or vacuum by the direct application of heat from combustible fuels, electricity, or nuclear energy, and shall also include an unfired pressure vessel, meaning a vessel in which pressure is obtained from an external source or from an indirect application of heat."

## "PART II

## ADMINISTRATION

Paragraph 2—REGISTRATION OF BOILERS:

Within six months from July 1st, 1949, all owners or users of boilers now in use or installed ready for use in the State of Tennessee, shall report to the Chief Inspector on forms prescribed by the Department, giving the location, type, capacity, age and date of installation."

"Paragraph 3—INSPECTION OF BOILERS AND UNFIRED PRESSURE VESSELS:

All power boilers shall be regularly inspected internally at least every 12 months. An external inspection shall be made annually approximately 6 months from the date of the internal.

All low pressure heating boilers shall be inspected both internally and externally every two (2) years where construction will permit.

All unfired pressure vessels subject to internal corrosion shall be inspected both internally and externally every two (2) years where construction will permit.

All unfired pressure vessels not subject to internal corrosion shall be given a certificate inspection every three (3) years.''

''Paragraph 4—NOTIFICATION FOR INSPECTION:

The owner or user shall prepare each boiler or unfired pressure vessel for internal inspection and shall prepare for and apply a hydrostatic pressure test whenever necessary, on the date specified by the Chief Inspector, Deputy Inspector, or Special Inspector, which date shall be not less than seven (7) days after the date of notification.''

''Paragraph 10—INSURANCE COMPANIES TO NOTIFY THE CHIEF INSPECTOR OF NEW, CANCELLED OR SUSPENDED RISKS:

All Insurance Companies shall notify the Chief Inspector within thirty (30) days of all boiler or unfired pressure vessel risks written, cancelled, not renewed or suspended because of unsafe conditions.''

''Paragraph 11—INSURANCE COMPANIES TO NOTIFY CHIEF INSPECTOR OF DEFECTIVE BOILERS OR UNFIRED PRESSURE VESSELS:

If an Insurance Inspector, upon the first inspection of a new risk, finds that the boiler or any of the ap-

purtenances are in such condition that his company refuses insurance, the company shall immediately notify the Chief Inspector and submit report of the defects. The owner-user inspector shall report in the same manner.''

''Paragraph 12—DEFECTIVE CONDITIONS DISCLOSED AT TIME OF EXTERNAL INSPECTIONS:

If upon an external inspection there is evidence of a leak or crack, enough of the covering of the boiler or unfired pressure vessel shall be removed to satisfy the Inspector in order that he may determine as to the safety of the boiler or unfired pressure vessel, or if the covering cannot be removed at that time, he may order the operation of the boiler or unfired pressure vessel stopped until such time as the covering can be removed and proper examination made.

## ''PART III

### CONSTRUCTION, INSTALLATION, INSPECTION, MAINTENANCE AND USE

### SECTION 5

### NEW INSTALLATIONS—HEATING BOILERS

1. REQUIREMENTS:

No Heating Boiler, except reinstalled boilers and those exempted by these Rules and Regulations, shall hereafter be installed in this State unless it has been constructed, inspected and stamped in conformity with Section 4 of the A. S. M. E. Boiler Construction Code and is approved, registered and inspected in accordance with the requirements of these Rules and Regulations.

All new heating boiler installations, including reinstalled boilers, must be installed in accordance with the requirements of the latest revision of the A. S. M. E. Boiler Construction Code and these Rules and Regulations."

"2. *INSPECTION:*

Upon completion of the installation, all boilers shall be inspected by the Chief Inspector, a Deputy Inspector, or a Special Inspector. At the time of this inspection, all steel heating boilers must be stamped with the serial number of the State of Tennessee, followed by the letters "TENN," said letters and figures to be not less than 5/16 inches in height. All cast iron heating boilers shall have securely attached to the front of the boiler a metal tag not less than one (1) inch in height, which shall have the serial number of the State of Tennessee stamped thereon.

It is recommended that the return water connections to all low pressure steam heating boilers supplying a gravity return heating system be so arranged as to form what is known as the 'Water Line Return' so that the water cannot be forced out of the boiler below the safe water level. This connection is shown in Figure H-3, Section 4, A. S. M. E. Boiler Construction Code."

"SECTION 6

"EXISTING INSTALLATIONS—HEATING BOILERS

8—WATER RELIEF VALVES:

Each Hot Water Heating or Hot Water Supply boiler shall have one or more relief valves of the spring loaded type without disc guides on the pressure side of the valve.

The valves shall be set to relieve at a pressure at or below the maximum allowable working pressure of the boiler and so arranged that they cannot be reset to relieve at a higher pressure of the boiler.

Each relief valve shall have a substantial device which will positively lift the disc from its seat at least 1/16 in. when there is no pressure on the boiler.

Such valves shall be B. T. U. rated and shall bear the A. S. M. E. and National Board stamp.''

In our opinion, if the trial Judge had given this requested instruction to the jury, it would have constituted error, because we do not find any language in Chapter 27, of Title 53, Tennessee Code Annotated, or in the Rules and Regulations of the Board of Boiler Rules which places upon the architect or the contractor any responsibility for obtaining a boiler inspection by the State Inspector.

On the contrary, there is some language in the Rules and Regulations which could be construed as placing this responsibility up on the owner and, under some circumstances, the insurance company.

Of course, this responsibility could be placed upon the architect or contractor by an express agreement of the parties, or by their conduct, such an agreement could be implied.

Plaintiffs insist that such an express agreement was made in the following language of the contract with Wright:

''* * * all work shall comply with applicable codes and regulations in effect locally.'' (Ex. No. 2, page 14-1)

■ ¨ However, we think this language applies only to construction and installation of the boiler and the meaning thereof cannot be enlarged so as to include the duty of obtaining an inspection by the State Inspector. We note that this contract provided that *all work* shall comply with applicable codes and regulations in effect locally.

■ Plaintiffs introduced some evidence tending to show that it is customary for the contractor to obtain such inspection. But, the defendants introduced some countervailing evidence tending to show that such was not customary. This created an issue of fact for the jury and apparently the jury resolved this factual issue in favor of the defendants.

We have read the entire charge of the Court and after considering it, with the entire record, we do not think it was error for the trial Judge to refuse to give the foregoing special request in his instructions to the jury, and assignment of error number two is overruled.

In arguing assignment of error number three, counsel for plaintiffs insists that the trial Judge submitted a question of law to the jury and that this was error, since it is the duty of the Court to pass upon questions of law.

■ We cannot agree with counsel that this instruction placed upon the jury the duty of deciding any question of law. As we construe the language used therein, the jury was instructed to apply the regulations to the facts appearing in evidence, which, of course, was a proper matter to submit to the jury.

We specifically point out that the issue submitted to the jury under this instruction was contained in the following language: .

"It will be for you to determine from *all of the evidence* whether or not the parties or any of them had the duty of complying with this regulation and whether or not that duty was breached." (Emphasis added.)

We agree with counsel for defendants that the Court could have quite properly declined to give any instruction to the jury regarding the duty of inspection, in the absence of a contractual provision or a custom requiring it, since, as we have heretofore stated, we find no language in the statute or in the Rules and Regulations of the Board of Boiler Rules which could be construed as placing upon the defendants the duty of obtaining such inspection by the State Inspector.

Therefore, this instruction was much more favorable to the theory of the plaintiffs than it was to the theory of the defendants and if it was erroneous, such error was not prejudicial to plaintiffs. Assignment of error number three is overruled.

We will discuss assignments of error four and five together, since they contain substantially the same subject matter.

Counsel for plaintiffs insists that since the boiler had two pressure relief valves on it, then both valves should comply with the regulations which we have set forth elsewhere in this opinion. This particular phase of the case was the subject of much controversy between counsel for plaintiffs and counsel for defendants.

Counsel for plaintiffs contended that the regulations required that more than one, pressure relief valve be installed on the boiler in question and that, since more than one was actually installed, then all of them must be preset in such a manner as to relieve pressure upon the boiler

before that pressure exceeded the maximum working pressure of such boiler.

It was the theory of defendants that so long as one of the pressure relief valves conformed with the rules and regulations, then it made no difference whether the other valves conformed or not, unless the evidence showed that a nonconforming valve was the proximate cause of the explosion.

■ Counsel for defendants are correct in their contention, because proximate cause is certainly an essential element of the right to recover. Mitchell v. Ketner, 54 Tenn.App. 656, 393 S.W.2d 755 (1965) ; Pearce v. Canady, 52 Tenn.App. 343, 373 S.W.2d 617; Biggert v. Memphis Power & Light Co., 168 Tenn. 638, 80 S.W.2d 90; Bowling v. Hamblen County Motor Co., 16 Tenn.App. 52, 66 S.W.2d 229.

Therefore, we think it was proper for the learned trial Judge to refuse to give plaintiffs' special request number one which is embodied in assignment of error number four and in lieu of this request, to give the instruction embodied in assignment of error number five.

Again we say that when we consider the learned trial Judge's charge in its entirety, there is nothing in the record to show that the plaintiffs were prejudiced by the refusal of the Judge to give the instruction set forth in assignment of error number four and to give in lieu thereof the instruction set forth in assignment of error number five.

Upon consideration of the entire record and the authorities cited by counsel in their briefs, we have concluded that the plaintiffs had a fair and impartial trial and there is no reversible error in the record.

The judgments of the trial Court are affirmed with costs.

Shriver, P. J., (M. S.), and Humphreys, J., concur.